UNITED STATES FIDELITY & GUARANTY COMPANY, a corporation of Maryland, Appellant,

v.

CRAIG COUNTY BANK OF VINITA, OKLAHOMA, a corporation; Charles S. Hampton; J. C. Lovett; James George; O. Stanislaus; and H. L. (Henry) Collins, Appellees.

CRAIG COUNTY BANK OF VINITA, OKLAHOMA, a corporation, Cross-Appellant,

v.

UNITED STATES FIDELITY & GUARANTY COMPANY, a corporation of Maryland; Charles S. Hampton; J. C. Lovett; James George; O. Stanislaus; and H. L. (Henry) Collins, Cross-Appellees.

Nos. 5068, 5069.

United States Court of Appeals Tenth Circuit.

Oct. 31, 1955.

B. W. Tabor and C. N. Haskell, Tulsa, Okl., for appellant and cross-appellee, United States Fidelity & Guaranty Co.

**800**

Robert D. Hudson, Tulsa, Okl. (Richard L. Wheatley, Vinita, Okl., on the brief), for appellee and cross-appellant, Craig County Bank of Vinita, Okl.

Jack L. Rorschach, Vinita, Okl., and W. L. Steger, Durant, Okl. (Gable, Gotwals & Hays, Tulsa, Okl., on the brief), for appellees and cross-appellees.

Before BRATTON, MURRAH, and PICKETT, Circuit Judges.

BRATTON, Circuit Judge.

United States Fidelity & Guaranty Company, hereinafter referred to as the bonding company, instituted this action against Craig County Bank of Vinita, Oklahoma, hereinafter referred to as the bank, Charles S. Hampton, J. C. Lovett, James George, O. Stanislaus, and H. L. Collins. The bonding company was engaged in the business among other things of writing bankers blanket bonds. The bank was engaged in the general banking business at Vinita. Lovett was president of the bank; Hampton was cashier; Lovett, Hampton, George, and Stanislaus were directors; and Collins was a customer. The action was one for a declaratory judgment determining the rights and liabilities of the parties under a bankers blanket bond in the sum of $50,000 issued by the bonding company to the bank, and a certain written agreement into which Hampton, Lovett, George, and Stanislaus entered under date of December 11, 1951. The bond expressly covered any loss sustained through any dishonest, fraudulent, or criminal act of any of the employees of the bank, and it provided that it should be deemed terminated or cancelled as to any employee as soon as the bank should learn of any dishonest or fraudulent act on the party of such employee. In the written agreement, Hampton was denominated part of the first part, and Lovett, George, and Stanislaus, as individuals and directors of the bank, were denominated parties of the second part. The agreement recited that a recent examination of the bank disclosed several irregularities in the handling of the affairs of the bank and the falsification of the records of the bank by Hampton as cashier, recited that the directors desired to terminate the services of Hampton, recited that Hampton had requested a delay in the termination of his services, recited that Hampton would sell his stock and retire from the service of the bank at or prior to June 30, 1952, and recited that in the interim Hampton would devote his full time to making collections and otherwise improving the asset condition of the bank and would perform energetically and faithfully the services of cashier in a manner satisfactory to the board of directors. And following such recitals, the agreement provided that "the Directors, J. C. Lovett, James George and O. Stanislaus, as parties of the second part hereby agree to continue the services of the said Charles S. Hampton to a date not beyond the 30th day of June, 1952, and in doing so agree and guarantee individually and/or collectively as individuals or directors that the affairs of said bank shall and will be operated under their supervision and accept full responsibility for the acts of the said cashier in his capacity as an officer of said bank." By answer to the complaint, the bank pleaded that it suffered losses in the aggregate amount of $53,212.53 caused by Hampton's embezzlement of funds; pleaded estoppel on the part of the bonding company to assert non-liability; and sought judgment against the bonding company for the face amount of the bond. By cross claim against Lovett, George, and Stanislaus, the bank sought to recover under the written agreement. And by answer to the complaint and the cross claim, Lovett, George, and Stanislaus denied liability to the bonding company and the bank, respectively.

The judgment entered in the cause provided that the bank recover from the bonding company the sum of $50,000, with interest; provided that the bank recover from Hampton the sum of $53,-232.29, with interest; provided that the bank retain for a specified period the balance on deposit in a special account of Hampton; provided that during such

time, the bank reimburse itself out of such account for loss sustained by reason of unpaid and uncollectible notes, and reimburse itself for any loss sustained because of fraudulent, dishonest, or criminal acts of Hampton over and above the sum of $50,000; provided that at the expiration of such period of time, the bank pay to the bonding company any balance remaining in the account; provided that the bank take nothing as against Lovett, George, and Stanislaus; provided that the bonding company recover from Hampton the sum of $50,000 with interest from the date of the payment of such sum to the bank, less any sum recouped by the bonding company out of the reserve deposit in the bank account of Hampton; and provided that Collins take nothing as against the bonding company or any of the defendants. The bonding company perfected a general appeal from the judgment, and the bank perfected a cross appeal from the provision in the judgment denying it recovery upon its cross claim against the defendants, Lovett, George, and Stanislaus.

■ Approaching the contention from different points, the bonding company complains that the court erred in denying it exoneration of liability under the bond in respect to losses sustained by the bank as the result of embezzlements of Hampton. One ground upon which the court rested its denial of exoneration was that the bonding company waived termination of the bond with respect to coverage of Hampton and that such waiver worked an estoppel to urge exoneration. Whether the bonding company was effectively estopped to urge exoneration depended upon the facts. Evidence was adduced upon the trial which tended to show these facts. Hampton became cashier and active managing officer of the bank in 1938 and continued in that capacity until about December 1, 1952. Beginning December 4, and ending December 7, 1951, an examiner for Federal Deposit Insurance Corporation, examined the bank and made a report of the examination. The report disclosed six irregularities in the account between the bank and Collins. The substance of five of the irregularities was the making of an entry in the daily journal of a specified payment but not including the amount thereof in the daily journal total; and the substance of the sixth irregularity was receipt of a note payment, issuance of a receipt therefor, and failure to make any entry in the records of the bank. The report did not disclose any loss or shortage in the Collins account, or otherwise. The report complained that there were too many past due notes; that the deposits had not increased in keeping with the increase of deposits in other banks; that the bank had not progressed as it should have done; and that the banking house was not kept clean and in a sanitary condition. The bank examiner advised the State Bank Commissioner of Oklahoma respecting the result of the examination in relation to the Collins account. On December 11, 1951, the examiner and the bank commissioner called Lovett, George, and Stanislaus into a meeting at a local hotel, advised them that the irregularities in the Collins account had been discovered, and insisted that Hampton be removed as cashier. The three directors agreed, a letter was prepared requesting the resignation of Hampton, and Hampton was called into the meeting. He convinced the other directors that the best interests of the bank and the community would not be served by his immediate resignation. Thereupon, the examiner and the bank commissioner withdrew from the meeting and prepared the written agreement to which reference has been made. They returned with the prepared agreement, and it was signed by Hampton, Lovett, George, and Stanislaus. In entering into the agreement, Lovett, George, and Stanislaus accepted and relied upon the statements of the bank examiner and the bank commissioner that no shortages had been discovered and no losses had been sustained. And no losses were sustained by the bank arising out of the

irregularities in the Collins account. On the next day after the meeting and the execution of the written agreement and again two or three days later, the bonding company was advised in writing of the irregularities outlined in the report of the bank examiner. That was done by Hampton and by the bank commissioner, respectively. Sometime later, Hampton talked with the agent of the bonding company through whom the bond was obtained respecting the matter and he showed the agent a copy of the written agreement. The agent told Hampton that he did not think the bonding company would cancel the bond, and he assured Hampton that he would advise him if it were cancelled. The agent advised the company of the conference with Hampton and suggested that the matter be investigated. A claim adjuster of the company was sent to Vinita to make the investigation. Another claim adjuster was sent later to make further investigation. One of the claim adjusters had with him a list of the irregularities contained in the report of the examination of the bank. Both claim adjusters went to the bank and talked with Hampton. The claim adjuster last calling at the bank placed in the file of the bonding company a memorandum saying "He (Hampton) said he was going to sue the other fellow and the other fellow was going to sue him. I don't see how bank or U. S. F. & G. are in anyway involved. Do you see anything else to do?" Below the signature of the claim adjuster appeared the statement in long hand "Just retain file for record purposes. AMB." In April, 1952, Stanislaus called on the local agent of the bonding company in Vinita, advised him that a meeting of the directors of the bank would be held that afternoon, and requested him to call the office of the company at Oklahoma City and inquire whether the bond was still in force and effect as to Hampton. The agent of the company called the superintendent of the surety department of the company at Oklahoma City and made the inquiry. The superintendent of the surety department advised the local agent that the bond was in full force and effect and the agent in turn advised Stanislaus that he had received such information. Stanislaus relied upon the information thus given him, believed the bond was in force and effect as to Hampton, and therefore made no effort to secure another bond from another company covering Hampton. It was the practice of the bonding company to send at regular intervals to a bank covered by a bankers blanket bond a questionaire which disclosed the names of the employees of the bank. The information furnished in that manner was used by the bonding company in calculating the amount of the premium on the bond. In November, 1952, the bonding company sent such a questionnaire to the bank at Vinita. It was completed and returned, and it disclosed that Hampton was still an employee of the bank. Following receipt of the questionnaire, the bond was placed in effect for the period beginning December 11, 1952 and ending December 11, 1953; and the bank was billed for the premium covering that period but the premium was not paid. Instead, the bank was under new management and a new bond was obtained from another company through a local agent in Vinita. Beginning late in 1952, after the change in management, it was discovered that arising out of certain embezzlements of Hampton, the bank had sustained various losses. A representative of the bonding company stated to the bank and to Hampton that the losses would be paid; and in January, 1953, the bonding company obtained from Hampton an assignment of the balance in the bank account of Hampton with the understanding that the proceeds thereof would be used to reimburse the bonding company for payments under the bond caused by the defalcations. At the same time, the bonding company obtained from Hampton an assignment of an insurance policy with a like understanding. It is plain from this resume of the facts that the report of the examination of the bank disclosed irregularities only in respect to the Collins account; that such irregularities did not involve any shortage or loss; that the

bonding company soon obtained all of the information which the directors of the bank had respecting the irregularities; that the bonding company made an examination of its own choice concerning such irregularities; and that the bonding company apparently reached the conclusion that there had not been any breach of the bond in respect to coverage of Hampton. It is equally clear that the bonding company advised one of the directors that the bond was in force and effect as to Hampton; and that relying upon such information, the director made no effort to obtain another bond from another company. It is equally clear that the bonding company took steps looking to the extension of the bond, including fidelity coverage of Hampton as an employee. And it is equally clear that the bonding company obtained from Hampton the assignment of the balance in the bank account as well as an assignment of the policy of insurance with the understanding that the proceeds thereof would be used to reimburse the bonding company for payments made to cover defalcations of Hampton. The entire course of conduct on the part of the bonding company indicated that it understood the bond was still in force and effect as to Hampton. With knowledge of all the facts which the directors had relating to termination of the bond in respect to coverage of Hampton, the bonding company's continued recognition of the validity and effectiveness of the bond constituted an implied waiver of its termination as to coverage of Hampton and worked an estoppel to assert exoneration of liability under the terms and provisions of the bond. Sovereign Camp W. O. W. v. Pettigrew, 98 Okl. 138, 224 P. 545; Commercial Standard Insurance Co. v. Remer, 10 Cir., 119 F.2d 66.

■ The bonding company contends that the court erred in holding valid an assignment to the bank of a deposit in the bank account of Hampton as against losses caused by Hampton's embezzlements and as against the equitable right of subrogation of the bonding company to the right of the bank in the fund. In November, 1952, Lovett, George, Stanislaus, and Hampton sold their stock in the bank; and the purchasers took over management of the bank about December 1. At the time Hampton's stock was purchased it was mutually agreed that Hampton would leave a deposit with the bank to be used in taking up uncollectible notes. The deposit—in the sum of $15,000—represented proceeds of the sale of the stock and it was made pursuant to such agreement. The losses arising out of Hampton's embezzlements became known, beginning soon after the change in management of the bank; and under date of December 15, the assignment to the bank was executed. A portion of the fund was used to take up uncollectible notes. At the time of the trial the balance in the fund amounted to $6,114.21. And the president of the bank estimated that an additional $3,000 in notes would be uncollectible. It is argued that under the law of Oklahoma, the bank had a lien upon Hampton's stock to secure his indebtedness to the bank which would have been discovered had the directors discharged Hampton on December 11, 1951, or had they given full information to the bonding company so that an audit could have been made to disclose the losses; that the equitable lien upon the stock was transferred to the fund; that such lien was prior and superior to the right to payment for uncollectible notes; and that if the bonding company is called upon to pay the losses occasioned by the embezzlements, it is entitled to be subrogated to such prior and superior equitable right to the fund. At the time of the sale of Hampton's stock, the bank did not know of the embezzlements; did not know that Hampton was indebted to it in any sum for embezzlements; and did not know that it had an equitable lien upon the stock. The bank did nothing with knowledge of the facts which amounted to a waiver of an equitable lien upon such stock. After the stock had passed into other ownership, the bank learned for

the first time that embezzlements had occurred, and it thereupon took the assignment of the balance in the bank account to be used in saving it against loss. It is manifest that the bonding company is not entitled by subrogation or otherwise to any equitable right in the fund prior and superior to that of the bank under its assignment.

█ Finally, the bonding company on its appeal, and the bank on its cross appeal, urge separately that the court fell into reversible error in not entering judgment against Lovett, George, and Stanislaus. The contention is not based upon any asserted liability for failure or neglect of legal duty as directors of the bank. It is predicated solely upon the written agreement into which such parties entered on December 11, 1951. Neither the bonding company nor the bank was a party to the agreement, and neither was expressly referred to therein as a third party beneficiary. Treating the agreement as ambiguous, the court heard evidence relating to the facts and circumstances leading up to its execution. And the court found that the agreement was not executed for the benefit of the bank; that it was not intended to supersede the bonding company as surety on Hampton's bond; and that it was executed largely for the benefit of the bank commissioner in order that he could have it in his file to explain why he did not insist upon Hampton being removed immediately as cashier upon the discovery that he had violated certain banking laws of Oklahoma. When the facts leading up to the execution of the agreement, and the obligating language contained in the agreement, are considered together it is clear that it was not the intention, purpose, or contemplation of the agreement to create, pledge, or commit the personal responsibility of the parties thereto as indemnity or other similar protection for the bank or the bonding company against loss sustained as the result of embezzlements or similar defalcations on the part of Hampton, and therefore the agreement did not constitute any basis for the rendition of judgment against Lovett, George, and Stanislaus.

The judgment is affirmed.